IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| SECTEK INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-1631-GBL-MSN |
| | ) | |
| JEANETTE S. DIAMOND, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the six-day non-jury trial of Plaintiff SecTek, Incorporated's ("SecTek") claims against Defendant Jeanette S. Diamond ("Ms. Diamond"), arising from SecTek's purchase of The Diamond Group ("TDG") from Ms. Diamond, pursuant to a Stock Purchase Agreement ("SPA"). (Dkt. 71 at 1). Ms. Diamond also asserted a counterclaim against SecTek involving the SPA, for breaching the implied covenant of good faith and fair dealing.

SecTek filed its Second Amended Complaint on May 27, 2016, asserting eight causes of action: (1) breach of contract relating to indemnification under the SPA for the tax assessment (Count 1); (2) breach of contract relating to indemnification under the SPA for the Texas Lawsuit (Count 2); (3) fraud in the inducement (Count 3); (4) constructive fraud in the inducement (Count 4); (5) breach of contract relating to indemnification under the SPA for fraud (Count 5); (6) securities fraud under 17 C.F.R. § 240.10b-5 (Count 6); (7) specific performance for breach of contract under tax indemnification (Count 7); and (8) specific performance for breach of contract under indemnification for the Texas Lawsuit (Count 8). *See* Dkt. 67.

.

All of the counts remained after the summary judgment stage.  On August 29, 2016, the Court denied both SecTek and Ms. Diamond's Motions for Partial Summary Judgment because there were genuine issues of material fact regarding (1) the Tax Assessment and the options for reducing it, and (2) whether there was a TDG office in New Mexico at the time the SPA was executed.  (Dkt. 123 at 2).  The Court heard testimony and received evidence with respect to these two issues, and also on the issues directly connected to the Counts alleged in the Second Amended Complaint.

There are three issues currently before the Court.  The first issue is whether Ms. Diamond breached the terms of the SPA by failing to indemnify SecTek for the New Mexico tax assessment, the Texas civil lawsuit, and fraudulent behavior.  The second issue is whether Ms. Diamond fraudulently induced SecTek into executing the SPA by failing to disclose and intentionally omitting information sought by SecTek, which concerned TDG's New Mexico gross receipts tax liabilities.  The third issue is whether SecTek CEO Wilfred Blood ("Mr. Blood") demonstrated bad faith by refusing to invoice a wage adjustment contract in order to avoid paying Ms. Diamond money she was owed under the SPA.

The Court enters judgment in favor of Plaintiff SecTek on Counts 1, 2, 3, 5, and 6 because the Plaintiff has met its burden in demonstrating: (1) by a preponderance of the evidence that Ms. Diamond breached the terms of the SPA; and (2) by clear and convincing evidence, that Ms. Diamond fraudulently induced SecTek into executing the SPA.  With respect to Count 4, which is Plaintiff's claim for constructive fraud in the inducement, the Court enters judgment in favor of Defendant Ms. Diamond and against Plaintiff SecTek.  Additionally, the Court enters judgment in favor of Defendant on her counterclaim of breach of the implied covenant of good

2

faith and fair dealing (Counterclaim Count 1) because Mr. Blood's actions, with respect to tendering funds owed to Ms. Diamond under the SPA, amount to bad faith.

## STANDARD OF REVIEW

In a non-jury case, the court must make specific findings of fact and separately state its conclusions of law. Fed. R. Civ. P. 52(a) (1). The trial judge has a function of finding the facts, weighing the evidence, and choosing from among conflicting inferences and conclusions those which he considers the most reasonable. *Taylor v. Republic Services, Inc.*, 968 F. Supp. 2d 768, 775 (citing *Penn-Texas Corp. v. Morse*, 242 F.2d 234, 247 (7th Cir. 1957)). The trial judge has the inherent right to disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias. *Id.* (citation and internal quotation marks omitted); *see Columbus-Am. Discovery Grp. V. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) (stating that the fact finder is in a better position to make judgments about the reliability of some forms of evidence, including evaluation of the credibility of witnesses). It is the duty of the trial judge sitting without a jury to appraise the testimony and demeanor of witnesses. *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889 (4th Cir. 1964).

To satisfy the demands of Rule 52(a), a trial court must do more than announce statements of ultimate fact. *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986) (citation omitted). The court must support its rulings by spelling out the subordinate facts on which it relies. *Id.* The language of Rule 52 has been construed:

> not to require a court to make findings on all facts presented or to
> make detailed evidentiary findings; if the findings are sufficient to
> support the ultimate conclusion of the court they are sufficient.
> Nor is it necessary that the trial court make findings asserting the
> negative of each issue of fact raised. It is sufficient if the special
> affirmative facts found by the court, construed as a whole, negative

> each rejected contention. The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence.

*Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962). This rule does not require that the trial court set out findings on the myriad of factual questions that arise in a case. *Taylor*, F. Supp. 2d at 776 (citing *Golf City, Inc. v. Wilson Sporting Goods*, 555 F.2d 426, 433 (5th Cir. 1977)). The sufficiency of the trial court's findings depends upon the particular facts of each individual case, and no general rule can govern. *Darter*, 301 F.2d at 75.

## FINDINGS OF FACT

The following are findings of fact made by the Court after having an opportunity to observe the witnesses, consider the evidence, and weigh the credibility of the witnesses. As described in the following findings of fact, the Court finds that SecTek has proven, by a preponderance of the evidence, the following claims:    breach of contract relating to indemnification under the SPA for the tax assessment (Count 1); breach of contract relating to indemnification under the SPA for the Texas Lawsuit (Count 2); breach of contract relating to indemnification under the SPA for fraud (Count 5); and, securities fraud under § 10(b) of the Securities Exchange Act and 17 C.F.R. §240.10b-5 (Count 6).   Additionally, the Court finds that SecTek has proven, by clear and convincing evidence, the claim for fraud in the inducement (Count 3).   With respect to Count 4, which is Plaintiff's claim for constructive fraud in the inducement, the Court enters judgment in favor of Ms. Diamond and against Plaintiff SecTek.

Since SecTek has a remedy at law with respect to breach related to tax indemnification (Count 7) and breach of contract related to indemnification for the Texas Lawsuit (Count 8), the Court DENIES SecTek's request for specific performance on Count 7 and Count 8.

4

The Court also finds that Ms. Diamond has proved, by a preponderance of the evidence, that SecTek is liable for breaching the terms of the SPA for breaching the implied covenant of good faith and fair dealing with respect to the Piper Down wage adjustment contract (Counterclaim 1).

### A. Introduction

SecTek is a Virginia corporation with its principal place of business in Virginia. Amended Statement of Undisputed Facts (Dkt. 146, "Statement of Undisputed Facts") ¶ 1. The Defendant in this matter is Ms. Jeanette Diamond ("Ms. Diamond"), an individual who is a resident of Texas and the former principal and seller of TDG. *Id.* ¶ 2. TDG is a company that provides security guards at various federal government buildings in Texas and New Mexico. *Id.* ¶ 3. Prior to February 3, 2012 (the "Closing Date"), Ms. Diamond owned 100% of the outstanding shares of TDG stock. *Id.* ¶¶ 4, 21; Exhibit P1.[1] On February 3, 2012, SecTek purchased 100% of the stock of TDG from Ms. Diamond in a SPA. Statement of Undisputed Facts ¶ 4.

TDG began operations in New Mexico as early as 2006. *Id.* ¶ 5. TDG's operations in New Mexico consisted of providing security personnel at various federal office buildings throughout the state, including in the cities of Clovis, Farmington, Gallup, Santa Fe, Las Vegas, Hobbs, Roswell, and Las Cruces. *Id.* ¶ 5; Exhibit D40 at 244357.[2] Griggs Bennett ("Mr. Bennett") was TDG's Chief Financial Officer for the period of time at issue, and Jack King ("Mr. King") was TDG's Director of Operations.

Starting in fall 2007, TDG leased an office in Las Cruces, New Mexico (the "Las Cruces Office"). Exhibit P143. TDG signed subsequent one-year leases in 2008 and 2009 for the same

---

[1] Plaintiff's Exhibits will be referred herein as "Exhibit P ___ ".
[2] Defendant's Exhibits will be referred herein as "Exhibit D ___ ".

office.   Deposition of Jack King ("King Depo.") at 77:22-79:6;[3] Exhibit P127 at SEC13275;
Exhibit P144.   Also in 2008, according to the testimony of both Ms. Diamond and Mr. Bennett,
TDG leased office space in the basement of the federal building located on Gold Avenue in
Albuquerque, New Mexico ("Gold Avenue Office").   TDG also provided security guards at other
posts throughout New Mexico.   Exhibit D40 at SEC244357.   From 2008 to the present, TDG has
had approximately 40 to 60 posts at various locations throughout New Mexico.   *Id.*

### B. New Mexico Gross Receipt Taxes

Mr. Aaron Brown is the bureau chief of Audit Technical Support Services within the
Audit Compliance Division of the New Mexico Taxation & Revenue Department (the
"Department").   Deposition of Aaron Brown ("Brown Depo.") at 16:11 to 16:19.[4]   During Mr.
Brown's testimony, he explained that the state of New Mexico levies gross receipts taxes
("GRT") on all tangible sales and services that are sold in the state.   *Id.* at 30:8-10.   GRT
includes a state tax rate, as well as local option tax rates established by municipalities and
counties in New Mexico.   *Id.* at 30:6-31:13.   The local option tax rates are applied based upon
the counties or cities where the taxpayer maintains a location in the state of New Mexico.   *Id.*   If
a business has no physical locations in the state, it pays GRT only at the state rate, without any
local option taxes added.   *Id.*

By statute, the tax rate for a taxpayer who provides services in New Mexico is based on
the taxpayer's business location.   *See* N.M. Stat. Ann. § 7-1-14.   Furthermore, by regulation, the
Department requires taxpayers with multiple business locations to report gross receipts by each
location as defined in the regulation.   *See* Reg. 3.1.4.13 NMAC.   A taxpayer is required to report

---

[3] Mr. King's deposition was read into the record at trial.
[4] Mr. Brown's deposition was read into the record at trial.

receipts for the location where the place of business is located, even though services may be performed in other locations in the state. Brown Depo. at 40:1-23.

In New Mexico, a business location can include each site where the company maintains an office or, in the absence of an office, can include locations where the company operates from space provided at a customer location. Exhibit P99; *see also* Reg. 3.1.4.13 NMAC. Regulation 3.1.4.13 further provides that space provided by a client can constitute a business location if the following conditions are present:

> (a) the space is occupied by the provider of the service for a period of six consecutive months or longer;
> (b) the provider or employees of the provider of the service are expected, by the purchaser of the services or representatives of the purchaser, to be available at that location during established times; and,
> (c) critical elements of the services are performed at, managed, or coordinated from the purchaser's location.

Reg. 3.1.4.13(G)(1) NMAC. The regulation also lists indicia to consider in determining whether the conditions above are present:

> (a) the provider of the service has assigned employees to the client's location as a condition of employment;
> (b) telephone is assigned for the exclusive use by the service provider;
> (c) the space has been designated for the use of the service provider;
> (d) the space contains office furniture or equipment furnished by either the client or the service provider for the sole use of the service provider;
> (e) the service provider is identified by business name on a sign located in or adjacent to the provided space;
> (f) the client or other persons can expect to communicate, either in person or by telephone, with the service provider or employees or representatives of the service provider at the space provided by the client; and
> (g) the contract between the client and the service provider requires the client to provide space to the service provider.

Reg. 3.1.4.13(G)(2) NMAC. Finally, Regulation 3.1.4.13 provides the following pertinent language:

> Any person meeting the three conditions as evidenced by the listed indicia must report the receipts derived from the performance of the service at the client's location to the municipality or county in which the furnished space is located.

Reg. 3.1.4.13(G)(3). NMAC.

Both Ms. Diamond and Mr. Bennett testified that the Las Cruces Office and the Gold Avenue Office subjected TDG to an in-state tax rate with respect to New Mexico GRT, even though TDG's New Mexico contract was managed from TDG's corporate office in Dallas, Texas. According to the Department, the location where a company manages contracts and accounting books is irrelevant in determining whether a company is subject to an in-state or out-of-state tax rate on gross receipts. Brown Depo. at 51:7-52:21. The Court finds that since TDG began operations in New Mexico, it has been subject to GRT on receipts derived from its New Mexico operations.

### C. The Managed Audit Agreement

Although TDG was subject to GRT on gross receipts derived from its New Mexico operations, TDG failed to report any gross receipts or pay any GRT to New Mexico from October 2006 through November 2008. Statement of Undisputed Facts ¶ 7; Exhibit P127, Taxation & Revenue Department Managed Audit Option – A, Audit Narrative ("Managed Audit Narrative") at SEC13275. In October 2008, after becoming aware of its failure to pay GRT on the gross receipts from its New Mexico operations, TDG entered into a Gross Receipts and Compensating Tax Managed Audit Agreement, Option A (the "Managed Audit Agreement") with the Department regarding TDG's failure to report any gross receipts and pay any gross GRT from October 2006 through November 2008. Exhibit P127 at SEC13275. According to Mr.

Bennett, the purpose of the Managed Audit Agreement was to bring TDG into compliance with New Mexico tax laws.

A managed audit provides a taxpayer with the opportunity to self-report to the Department a failure to comply with New Mexico tax law, and thereby avoid penalties and interest. Brown Depo. at 59:3-61:19. Unlike an audit initiated by the Department (which TDG was subjected to in 2013 and 2014 and which resulted in the assessment at issue in this litigation), a managed audit "Option A" is more limited in scope. Brown Depo. at 62:2-63:6. When a taxpayer selects "Option A," as TDG did in 2008, the Department simply accepts the information submitted by the taxpayer, does not review it for correctness, and calculates the amount of unpaid taxes based on the taxpayer-provided information. *Id.*

On December 31, 2008, TDG submitted a check to the Department in the amount of $192,414 to be applied to the assessment that would result from the Managed Audit Agreement. Exhibit P127 at SEC13275. On October 23, 2009, in connection with the Managed Audit Agreement, TDG submitted GRT returns for those periods in 2007 and 2008 for which it failed to report gross receipts and to pay the applicable tax on those receipts. Statement of Undisputed Facts ¶ 10; *see also* Exhibit P125. In November of 2009, based on the forms submitted by TDG, the Department assessed $206,880.59 in unpaid GRT. Statement of Undisputed Facts ¶ 11. TDG was credited $192,414 because of the check TDG submitted in December of 2008, and ultimately paid the full amount assessed. Exhibit P125; Exhibit P128A at SEC13292-93.

Mr. Bennett testified that at the time the managed audit was completed in October 2009, TDG maintained offices in Las Cruces, and in Albuquerque, on Gold Avenue.

9

**D. TDG Offices in New Mexico**

Mr. Bennett testified that in late 2009, after the managed audit, he discussed with Mr. King and Ms. Diamond the possibility of closing TDG's locations in Las Cruces and Albuquerque. Mr. Bennett believed that TDG would have to pay GRT at a higher, in-state rate unless the offices were closed. Mr. Bennett stated that he informed Ms. Diamond of his belief, and Ms. Diamond instructed him to close the offices. This testimony was corroborated by Ms. Diamond herself. The Court finds that TDG did not, however, follow through on this supposed plan. Instead, TDG remained in the Las Cruces Office until 2011 and closed its existing Gold Avenue Office in favor of moving it to a different location in Albuquerque—albeit through TDG employee Guillermo B. Chavez ("Mr. Chavez") on behalf of TDG. Mr. Chavez testified that he was a Lieutenant Supervisor at TDG and in late 2010 became a Captain.

With respect to the Las Cruces Office, TDG began leasing the Las Cruces Office in the fall of 2007. Exhibit P143. TDG subsequently signed one-year leases in 2008 and 2009 for the same office space. Exhibit P144; King Dep. 79:1-79:6. In July 2010, Mr. King directed a TDG employee, Wendy Eisen ("Ms. Eisen") to sign a lease in her own name for the Las Cruces Office for use by TDG. King Depo. 81:21-83:2; Exhibits P147, P148, P151-P155, P157-P159. Ms. Eisen, who is Ms. Diamond's daughter, was a receptionist in TDG's Dallas office and was not involved with TDG's New Mexico operations. King Dep. 81:2-8. TDG reimbursed Ms. Eisen for payments she personally made for rent for the Las Cruces Office through January 2011. Exhibit P269.

Ms. Diamond testified that it would be unusual for her daughter to be the tenant in name for space used by TDG and that there is not a business reason for TDG to put a company lease in her daughter's name. Deposition of Jeanette Diamond ("Diamond Depo.") at 58:2-8. The Las

Cruces Office remained open until January 2011.  Exhibits P157-P159.  Because it remained open, the Las Cruces Office subjected TDG to New Mexico GRT at the in-state rate.

With respect to the Albuquerque office, Mr. Chavez testified that in December of 2009, Mr. King instructed him to lease, in his own name, new office space for TDG.  Mr. Chavez stated that he found a location in Albuquerque at 508 ½ Central Avenue ("Central Avenue Office").  *See also* Statement of Undisputed Facts ¶ 13.  Ms. Diamond's son, Stuart Diamond, who was also an employee of TDG, assisted Mr. Chavez in opening the Central Avenue Office by setting up phone, fax, and internet service.  Exhibit P130.

On December 23, 2009, Mr. Chavez paid the first month's rent and security deposit from his own funds and Mr. King approved his request to TDG for reimbursement of those amounts. Statement of Undisputed Facts ¶ 14; *see also* Exhibits P136-138.  Thereafter, Mr. Chavez paid the rent every month with personal checks beginning in January 2010 through the 2012 sale of TDG's stock to SecTek.  Statement of Undisputed Facts ¶ 14.  In accordance with instructions emailed by Mr. King to Mr. Chavez (and copied to TDG's then accountant, Susana Medina ("Ms. Medina")), Mr. Chavez testified that he submitted copies of his personal checks with his monthly expense reports for the "office rent."  *Id.*  These expense reports were approved by Mr. King and processed by Ms. Medina, who would stamp the reports with her name.  *Id.*

TDG reimbursed Mr. Chavez for the monthly rent payments for the Central Avenue Office from December 2009 to February 2012.  Exhibits P223 and P224.  Several of the checks later written by TDG to reimburse Mr. Chavez for office rent that he paid were signed by Ms. Diamond, either by hand or with her signature stamp.  Diamond Depo. at 70:12-22, 72:9-19, 73:4-11, 76:18-20, 77:16-19.   The Central Avenue Office was utilized by TDG beginning in December 2009, and remained open through the Closing Date.  Exhibits P223, P224.

In June 2011, under penalty of perjury, Ms. Diamond signed TDG's Private Patrol Company Renewal Application (the "Patrol Application") and submitted it to the New Mexico Regulation and Licensing Department.   Statement of Undisputed Facts ¶ 16.   The Patrol Application lists the Central Avenue Office as TDG's physical New Mexico address and mailing address.  Exhibit 226 at SEC13876.  After 2009, TDG paid GRT at the lower out-of-state rate, even though it (1) did not close the Las Cruces office until late January 2011, and (2) maintained the Central Avenue Office throughout 2010, 2011, and 2012 until the sale of TDG in February 2012.  Exhibit P95 at NMTD 57-86.

### E. TDG Sought Reimbursement for Gross Receipts under Federal Government Contracts partially based on the higher "In-State" Rate

Ms. Diamond testified that as of the end of 2009 she believed the New Mexico offices were closed to avoid the in-state rate and that, going forward, she anticipated that TDG would only be paying GRT at the out-of-state rate.  Diamond Depo. at 85:9-13, 86:24-87:14.  TDG sought and obtained increased compensation from the federal government based on its representations to the Government that it paid GRT at in-state rates for Albuquerque and Las Cruces.  Exhibit P160-167.  TDG adjustment requests submitted under the Service Contract Act ("SCA"), 41 U.S.C. § 351 *et seq.*, certify that the amount sought accurately reflects the contract adjustment for which the government was liable.  *Id.*  GRT was a component of SCA adjustments sought by TDG, which were submitted by Ms. Diamond and approved by the government after 2009 when Ms. Diamond says she believed that TDG closed its New Mexico offices and would thus be subject to the lower out-of-state rate.  Diamond Depo. 81:14-16, 82:22-24, 83:1-15, 86:13-87:14.  Accordingly, the evidence shows that Ms. Diamond sought payment from the federal government for GRT in an amount greater than she claims she believed TDG was required to pay to New Mexico.

**F.  Diamond's Pass-through Tax Return  Compared to TDG's Gross Receipts Tax Returns**

TDG's Pass-through entity tax return for 2011 shows gross receipts of $5,479,948 with respect to revenue generated within New Mexico.  Exhibit D45 at SEC13550.

**G. SecTek's Due Diligence for the TDG Acquisition**

At all times relevant to this litigation, Wilfred Blood ("Mr. Blood"), is and has been Chief Executive Officer of SecTek.  Statement of Undisptued Facts ¶ 17.  Mr. Blood testified that in August of 2011, he received a solicitation call from a business broker engaged by Ms. Diamond to help her sell TDG.  Mr. Blood further testified that in late 2011, SecTek began conducting due diligence regarding TDG's business operations and financial performance. Although everyone at TDG could answer questions during the due diligence process, Ms. Diamond testified that she designated Mr. Bennett as the principal point of contact for SecTek due diligence matters.

In connection with the due diligence, Mr. Blood testified that SecTek sent Mr. Bennett a Due Diligence Request List (the "Diligence List").  Statement of Undisputed Facts ¶ 18.  A copy of the Diligence List, with Mr. Bennett's handwritten responses, was emailed back to Mr. Blood by Mr. Bennett on December 16, 2011.  *Id.* ¶ 19; Exhibit P2.  Category Number 11 of the Diligence List, titled "Physical Facilities," requested, *inter alia*, information about "[a]ll outstanding leases, subleases, rental agreements and the like for real property . . . ."  Exhibit P2 at SEC20110.  The copy of the Diligence List returned to Mr. Blood on December 16, 2011 provided no information about that item.  *Id.*  Additionally, on December 28, 2011, Mr. Bennett sent Mr. Blood a follow-up email regarding the Diligence List.  Statement of Undisputed Facts ¶ 20; Exhibit P004.  In that email, Mr. Bennett falsely stated that TDG's corporate office in Dallas

was TDG's "only leased property," and failed to disclose the TDG Central Avenue Office in Albuquerque.  Exhibit P004.

Mr. Blood testified that when performing its due diligence, SecTek created an online data-room, accessible by all the parties and their counsel to the SPA transaction, wherein Mr. Bennett and others at TDG posted documents and information responsive to the Diligence List. Mr. Blood stated that the thirteen folders in the online data-room corresponded with the thirteen categories in the Diligence List, and Mr. Bennett testified that he and other TDG employees uploaded documents and information into those folders.  With respect to Category 11.c, which addressed, as previously mentioned, leases, subleases, and rental agreements, Mr. Bennett created a single page document and submitted it to the data-room.  Exhibit P3 at SEC00000077. That document states "See 11a," referring to another page of that document which addressed Category 11.a on the Diligence List.  *Id.*  Referring to TDG's Dallas office, the page for Category 11.a says "Corporate office is leased" but does not mention the Central Avenue Office in Albuquerque.  Exhibit P3 at SEC000075

Mr. Blood testified that in November 2011, before closing under the SPA, he attended meetings in Dallas with TDG staff, which included: Ms. Diamond, Mr. Bennett, Mr. King, and Ms. Medina.  Mr. Blood stated that he questioned Mr. King about TDG's operations, including its operations in New Mexico.  Mr. Blood said he specifically asked Mr. King whether TDG had any offices in addition to the Dallas corporate office.  Mr. King falsely stated that TDG did not have any other offices, as he failed to disclose the existence of the Central Avenue Office.  The evidence shows that Mr. King falsely stated that Mr. Chavez operated a virtual office in New Mexico, equipped with a suitcase, laptop, and mobile phone, when in reality, a physical office in Albuquerque existed.

Mr. Blood testified that he also asked Mr. Bennett about TDG's finances and accounting. Mr. Blood stated that he reviewed TDG's financial information, and noticed that the rate at which TDG paid GRT was lower than he expected.  This observation, Mr. Blood noted, was based on his work experience in the 1980s as Vice President and Controller of DynCorp International ("DynCorp").  At the time Mr. Blood worked there, DynCorp had physical offices in Las Cruces and Albuquerque and, thus, was subject to GRT at an in-state rate.  When Mr. Blood asked Mr. Bennett why TDG's GRT appeared to be low, Mr. Bennett falsely stated that TDG had no offices in New Mexico and thus paid the lower, out-of-state rate.  Michael Smigocki ("Mr. Smigocki"), SecTek's financial advisor, testified that Mr. Bennett told him that TDG had no offices in New Mexico.  At no point during due diligence or prior to the Closing Date did Mr. Bennett, Ms. Diamond, or any agent of Ms. Diamond inform SecTek or any of its agents about (1) the existence of the Central Avenue Office, (2) that TDG had been underreporting its gross receipts to the State of New Mexico, or (3) that TDG had been underpaying its GRT.  Exhibits P1-P4.

Mr. Blood testified that SecTek negotiated the purchase price in the SPA based on an earnings-based valuation of TDG's past financial performance.  Mr. Smigocki testified that he analyzed TDG's adjusted Earnings before Interest, Taxes, Depreciation, and Amortization ("EBITDA") based on information and analysis that he and SecTek received from Mr Bennett. Mr. Smigocki advised Mr. Blood regarding the value of TDG based on the information received from Mr. Bennett.

### H. The Sale of TDG to SecTek Closes on February 3, 2012

SecTek and Diamond entered into an SPA on February 3, 2012.  Statement of Undisputed Facts at ¶ 21; Exhibit P1.  Pursuant to the SPA, SecTek purchased all outstanding shares of stock

of TDG from Ms. Diamond.  Statement of Undisputed Facts at ¶ 21; Exhibit P1 at SEC 0013893.
Under § 2.3 of the SPA, the base Purchase Price for the acquisition of Ms. Diamond's shares in
TDG was comprised of $2.5 million in cash ("Buyer Cash Consideration") and a Promissory
Note in the amount of $1.3 million, totaling $3.8 million in consideration to Diamond in
connection with the sale (the "Purchase Price").  Exhibit P1 at SEC00013893-94.  Mr. Smigocki
testified that the $3.8 million Purchase Price included in the SPA was a 4.65 multiple of TDG's
average 2011 and 2010 adjusted EBITDA.  Pursuant to § 2.3 of the SPA, the Purchase Price was
subject to increase or decrease based in part on the amount of working capital delivered by Ms.
Diamond at closing.  Exhibit P1 at SEC 13893-94.

Under § 2.4(a) of the SPA, at closing, Ms. Diamond executed and provided to SecTek a
Certificate of Estimated Closing Net Working Capital and Estimated Balance Sheet (the
"Certificate") in which she represented that TDG's Closing Net Working Capital, as defined on
page 41 of the SPA, was $2,767,368.97.  Exhibit P1 at SEC00013894, SEC00014164.  In
pertinent part, the SPA defines Closing Net Working Capital as:

> [A]t the Closing, an amount equal to (i) current assets (including cash, cash
> equivalents, [a]ccounts [r]eceivable, inventory, and prepaid expenses) less (ii)
> current liabilities (including accounts payable, accrued current liabilities and any
> other short term liabilities . . .), calculated on a basis in conformity with GAAP.

Exhibit P1 at SEC00013934.  Pursuant to § 2.4(a)(ii) of the SPA, and as described by the
Certificate, the $2.5 million Buyer Cash Consideration payable to Ms. Diamond at closing was
reduced by $232,631.03 because the Closing Net Working Capital was that amount below the
Target Working Capital amount of $3 million.  Exhibit P1 at SEC00013894, SEC00014164.  The
$232,631.03 reduction in Buyer Cash Consideration was memorialized in a Flow of Funds
Memorandum, which was included in the closing binder of the SPA transaction.  Exhibit P1 at
SEC14157-58, SEC 14160.

1. Diamond's Representations in the SPA

In the SPA, "[t]o induce Buyer to enter into this Agreement," Ms. Diamond warranted and represented to SecTek that, as of the Closing Date, except as disclosed in Schedule 3.9 to the SPA,

(i) TDG had paid "currently as due all taxes levied or imposed including," gross receipts taxes;

(ii) "none of the Taxes are delinquent or constitute a lien against [TDG] except for statutory liens for current Taxes not yet due and payable, and no basis exists for any such liens;"

(iii) all "Tax Returns" required to be filed by TDG were "filed in accordance with applicable law" and "accurately reflect[ed] all Tax liabilities of [TDG] for the periods covered by thereby;" and

(iv) all "Taxes" for which TDG was liable "relating to any period ending on or prior to the Closing Date (or the portion of any Tax period beginning before and ending after the Closing Date) shall have been paid or, if not yet due and payable, properly accrued for as of the Closing Date" (the "Tax Warranty").

SPA § 3.9.1 and Schedule 3.9. *See* Exhibit P1, Section 3.9.1 at SEC00013901-02.

Section 3.9.1 of the SPA defines "Taxes" as "all taxes levied or imposed including, without limitation, . . . gross receipts taxes; . . . any interest or penalties with respect thereto; and any additions to tax or additional amounts imposed by any Governmental Authority . . . due and payable by [TDG]." Exhibit P1, SPA, § 3.9.1 at SEC00013898. Schedule 3.9 to the SPA disclosed no applicable exception to the warranties and representations of Ms. Diamond in § 3.9.1 of the SPA. Exhibit P1, SPA, at SEC00014029. The Court finds that the Tax Warranty by Ms. Diamond was materially false in that (1) Ms. Diamond failed to disclose that TDG failed to pay currently as due all GRT, (2) that TDG had not filed its returns for New Mexico GRT in accordance with New Mexico law, (3) that TDG had underpaid GRT for periods before the Closing Date.

Additionally, Ms. Diamond warranted and represented, under the SPA, to SecTek that TDG had "no debts, liabilities or obligations of any nature, accrued, absolute, contingent or otherwise, and whether due or to become due, arising out of the transactions entered into, or any state of facts existing, on or prior to the date of [the] Agreement other than (i) liabilities and obligations expressly disclosed in this Agreement or (ii) liabilities and obligations arising in the ordinary course of business . . ."(the "Financial Warranty").  *See* Exhibit P1, § 3.6 at SEC00013900.  The Court finds the Financial Warranty by Ms. Diamond materially false, as Ms. Diamond failed to disclose a liability which should have been accrued by TDG for the amount of GRT intentionally underpaid by TDG before the Closing Date, as well as all accrued penalties and interest thereon.

Under the SPA, Ms. Diamond made an additional warranty regarding TDG's leasehold interests.  Specifically, Ms. Diamond represented that copies of all Leases were made available to SecTek for SecTek's review and Schedule 3.15 to the Agreement listed all Leases in effect as of the Closing Date, along with descriptions of the subject properties, addresses, and other pertinent terms of all such Leases (the "Lease Warranty").  *See* Exhibit P1, § 3.15 at SEC13904. Schedule 3.15 to the Agreement disclosed TDG's Dallas, Texas office, as well as "an informal arrangement . . . pursuant to which it 'lease[d]' a small space in Ft. Worth, Texas . . . ."  Exhibit P1, SPA, Schedule 3.15 at SEC00014038.  The Court finds the Lease Warranty by Ms. Diamond materially false because Schedule 3.15 failed to disclose the lease for the Central Avenue Office.

Further, Ms. Diamond represented that "[o]ther than leasehold interests subject to leases listed on Schedule 3.15 [TDG did] not currently own any interest in real property" (the "Property Warranty").  *See* Exhibit P1, § 3.17 at SEC00013905.   The Court finds the Property Warranty by Ms. Diamond materially false because TDG had an interest in leased property by virtue of the

Central Avenue lease.  Ms. Diamond also represented that TDG was "in compliance in all material respects with all Laws and Orders" (the "Legal Compliance Warranty").  *See* Exhibit P1, § 3.12 at SEC00013903-04.  The Court finds the Legal Compliance Warranty by Ms. Diamond materially false because SecTek was not in compliance with New Mexico laws which imposed the GRT upon TDG.

Finally, Ms. Diamond represented that no representations or warranties by TDG or Ms. Diamond in the SPA "(i) contain[ed] or [would] as of the Closing Date contain any untrue statement of a material fact, or (ii) omitted or [would] as of the Closing Date omit to state, when read in conjunction with all of the information contained in the Agreement, the disclosure schedules [thereto] and any other document delivered in connection [with the Agreement], any fact necessary to make the statements or facts contained therein not misleading" (the "General Warranty").  *See* Exhibit P1, § 3.30 at SEC00013914.  For the aforementioned reasons, this representation and warranty by Diamond was also materially false.

### 2. Diamond's Indemnification Obligations under the SPA

Section 5.1.5(a) of the SPA obligates Ms. Diamond to indemnify, defend, and hold SecTek harmless for "Losses" arising from certain "Special Indemnities," including:

> any Taxes imposed on [TDG] (including underpayment penalties, interest and any Taxes imposed by any foreign taxing authority on the employees of [TDG]) pursuant to federal, state, local, or foreign Law and for Losses attributable to any periods or portions thereof ending on or before the Closing Date in excess of Taxes which are included as liabilities for the purposes of computing Estimated Closing Net Working Capital or Actual Closing Net Working Capital.

(the "Special Indemnity").  *See* Exhibit P1, § 5.1.5(a) at SEC00013917.

Section 5.1.2 of the SPA obligates Ms. Diamond, as the Seller under the SPA, to "indemnify, defend, and hold harmless [SecTek] from and against all Losses based upon, arising out of, resulting from or otherwise in respect of:

19

(i)      "[A]ny inaccuracy or breach of any representation or warranty made by [Diamond] or [TDG] in Article 3 of this Agreement or any disclosure schedule related thereto or in any certificate or Transaction Document delivered pursuant to this Agreement."   SPA § 5.1.2(a);

(ii)     "[A]ny liability or obligation relating to the operation of [TDG] prior to the Closing Date…" SPA § 5.1.2(d); and

(iii)    "[E]nforcing [SecTek's] indemnification rights provided for" under the Agreement. SPA § 5.1.2(e)."

(the "General Indemnity"). *See* Exhibit P1, § 5.1.2 at SEC00013916-17.

"Losses" are broadly defined by the SPA to encompass "all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, Liens (other than Permitted Liens), losses, disallowed costs or indirect rates, overbillings, expenses, and fees, including court costs and reasonable attorneys' fees and expenses." Exhibit P1, SPA, at SEC00013937. Under the SPA, "Lien" means "with respect to any asset, any mortgage, lien, pledge, charge, claim, security interest, or encumbrance of any kind in respect of such asset." Exhibit P1, SPA, at SEC00013936.

Mr. Blood testified that SecTek would not have entered into the SPA if he was informed that – contrary to oral and written representations by Ms. Diamond and her agents – TDG had an office in New Mexico. Mr. Blood further testified that SecTek also would not have entered into the SPA had he been informed that TDG leased the Central Avenue Office or that TDG was liable to New Mexico for the GRT ultimately assessed in 2014. Rather, had Mr. Blood and SecTek been told the truth on these matters, Mr. Blood would not have agreed to pay the Purchase Price set forth in the SPA. At a minimum, informed of the true state of affairs, Mr. Blood stated that SecTek would have undertaken additional due diligence and renegotiated the

purchase price for TDG, or not purchased TDG at all. The Court finds Mr. Blood's testimony credible.

### 3. The Operations of TDG after the Closing Date

On the Closing Date, following the SPA transaction, TDG became a wholly-owned subsidiary of SecTek. Statement of Undisputed Facts ¶ 22. Because Mr. King and Mr. Bennett remained in their senior management positions after SecTek acquired TDG, along with other office staff such as Ms. Medina, Mr. Blood stated that he allowed them to continue operate TDG just as they had before the sale and, thus, he did not supervise the TDG staff on a day-to-day basis. Rather, Mr. Blood testified that he was involved only in strategic or important business matters and decisions. Consequently, Mr. Blood stated that he was unaware that Mr. Chavez continued to submit to Mr. King and Ms. Medina his expense reports for his rent payments for the Albuquerque Office, and TDG staff did not advise Mr. Blood about the Albuquerque Office or that TDG reimbursed Mr. Chavez for the rent. Mr. Blood testified that until July 2015, he was not aware that TDG had an office in Albuquerque and that the Central Avenue Office had been leased in Mr. Chavez's name to avoid payment of GRT at the higher, in-state rate. Exhibit P199; Exhibit P200.

### I. 2013-2014 Department Audit of TDG's Gross Receipts Tax Payments

Beginning in September 2013, the Department began an audit of TDG (the "Field Audit") for the years 2008 through 2013 (the "Audit Period"). Statement of Undisputed Facts ¶ 25. Ms. Medina, an accountant employed by TDG at that time, was the Department's point-of-contact at TDG for the Field Audit. *Id.* Mr. Bennett testified that before TDG's acquisition by SecTek, he had, throughout his tenure at TDG and with little oversight, entrusted Ms. Medina to be responsible for filing monthly gross receipts tax reports with the Department and to keep track of

New Mexico gross receipts for tax reporting purposes.  Ms. Diamond described Ms. Medina as hard-working, dedicated and loyal.  Mr. Blood stated that Ms. Medina continued in that role after the acquisition, and all correspondence from the Department to TDG was directed to her.  Mr. Blood determined that Ms. Medina was the logical person to designate as the point person to communicate with the Department during the Field Audit and to respond to information requests.

Ms. Diamond testified she learned about the issue of GRT in September 2013, when she received a telephone call from Department Auditor Vincent Caputo ("Mr. Caputo").  Ms. Diamond sent a text message to Mr. Blood indicating that Mr. Caputo intended to conduct an audit, and that the audit "was not a big deal."  Exhibit P195 BLF 51-55.  Ms. Diamond stated that she instructed Mr. Caputo to contact Ms. Medina.

During the Field Audit, Ms. Medina provided the Department with TDG's gross receipts on a monthly basis for the Audit Period, but did not give the auditor any invoices from pre-sale periods.  Statement of Undisputed Facts ¶ 28; Exhibits P6-35, P50-51, P53, P55, P57, P63, P66.  Mr. Blood testified that Ms. Medina failed to give the auditor all documents or information he requested.  Ms. Medina did not dispute the information given to New Mexico or any of the conclusions reached by the auditor or by the audit at any stage of the process, which included the use of a May 2012 invoice to determine the allocation of receipts among posts for all periods, pre- and post-sale.  The auditor did not visit any of the posts of TDG, solely relying on the information provided by Ms. Medina.  Mr. Blood admitted that Ms. Medina failed to provide complete information to the New Mexico auditor, and that this led to the assessment.  However, Mr. Blood became aware that Ms. Medina failed to produce audit workpapers after the audit was complete; Mr. Blood stated that he did not know that Ms. Medina failed to turn over necessary

documents while the audit was taking place.  Mr. Blood also noted that Ms. Medina was terminated from TDG in September 2014.

On or about July 10, 2014, the Department issued a Notice of Assessment of Taxes and Demand for Payment (the "2014 Tax Assessment") to TDG seeking: (i) $1,180,483.47 for gross receipts tax from January 31, 2008 through September 30, 2013; (ii) $42,175.32 for withholding tax from January 31, 2008 through September 30, 2013; and (iii) $13,152.29 for worker's compensation fee audit assessment for March 31, 2007 through September 30, 2013.  Statement of Undisputed Facts ¶ 31; Exhibit P84. TDG underpaid its GRT by more than 25% for each of the months assessed in 2008-2010.  Exhibit P82.

The Tax Assessment provided a 90-day window to pay the amount due, file a protest, or provide documentation to show that the assessment was in error.  Exhibit P84. The Notice of Assessment provided that failure to take one of these steps would result in TDG becoming delinquent and subject to a lien on its assets.  *Id.*  On November 5, 2014, Howard Feldman, a lawyer for SecTek, sent Ms. Medina a letter blaming her for the mistakes in the audit, accusing her of breaching her fiduciary duties to TDG, and threatening to hold her liable for missing the 90-day protest window.  Exhibit P194, BLF00086-87

The 2014 Tax Assessment was issued as a result of TDG's underpayment of New Mexico GRT during the period January 2008-September 2013 for two reasons: 1) TDG paid gross receipts tax at an incorrect rate; and 2) TDG underreported its gross receipts in its monthly tax filings.  Exhibit P5, SEC00013415-415, 13497, 13581.  TDG also reported no gross receipts and paid no GRT from November 2009 through June 2010.  Exhibit P5, SEC00013576; Exhibit P95.

The Department claimed that TDG paid GRT during the period before the Closing Date at an incorrect rate.  Exhibit P5, SEC00013416-417.  The Department found that TDG paid GRT

at the incorrect rate because TDG paid GRT at the lower rate applicable to companies without a New Mexico business location. *Id.* The Department asserted that TDG should have been paying GRT at a higher rate applicable to companies with a New Mexico location. *Id.*

Based on the gross receipts information provided by Ms. Medina, TDG underreported its gross receipts by approximately $4.2 million from January 2008 through January 2012. This difference is derived by comparing the monthly gross receipts provided by Ms. Medina during the Field Audit ($18.6 million) to the gross receipts originally reported by TDG in its monthly tax returns and in connection with the Managed Audit ($14.2 million). Exhibits P5, P95, P125, and P268. However, following the assessment of GRT by New Mexico, SecTek determined that the $18.6 million in New Mexico gross receipts reported by Ms. Medina during the Field Audit was underreported by approximately $500,000-$600,000. Exhibit P267A-B, P275, P235, P242, and P243.

As noted above, a small portion of the 2014 Tax Assessment was a result of TDG's underpayment of New Mexico Workers Compensation Tax during the period March 2007-September 2013. Statement of Undisputed Facts ¶ 34; Exhibit P81. Ms. Diamond has since indemnified SecTek for the portion of workers' compensation tax payable by TDG for periods prior to the Closing Date. *Id.*

On September 26, 2014, the Department issued a Statement of Account ("2014 Statement of Account") to TDG. Statement of Undisputed Facts ¶35; Exhibit P82. The 2014 Statement of Account includes a month-by-month list of TDG's outstanding liability for gross receipts taxes, plus interest and penalties accrued as of that time for the period of April 2008 through June 30, 2014. *Id.* The 2014 Statement of Account showed an amount due of $1,209,775.09. *Id.* The 2014 TDG Statement of Account assessed gross receipts taxes in the amount of $533,085.23 for

24

periods prior to the Closing Date (the "Pre-Closing Taxes").  Exhibit P082.  The vast majority of the remainder of the amount assessed was for penalties and interests relating to the overdue gross receipts taxes.  *Id.*  The most current statement of account received from New Mexico is dated October 1, 2016.  Exhibit P289.

### J. SecTek Notifies Diamond of the Assessment and Demands Indemnification

On October 14, 2014, SecTek, through its counsel Eric Vendt, sent a letter (the "Notice Letter") to Ms. Diamond and her attorney, notifying Ms. Diamond of its request for indemnification for the GRT assessed by New Mexico for periods before the Closing Date, plus accrued penalties and interest.  Statement of Undisputed Facts ¶ 37; Exhibit P94.  The Notice Letter was delivered by overnight courier to both Ms. Diamond and her attorney in conformance with the terms of the SPA.  Statement of Undisputed Facts ¶ 37; *see also* Exhibit P1, SPA § 10.2 at SEC13929.  This letter, however, did not reference the fact that TDG missed the 90-day protest window.  Exhibit P94.

On October 24, 2014, Ms. Diamond's lawyer sent SecTek's lawyer a letter saying Ms. Diamond would consider taking on the defense of the tax assessment by New Mexico, but that Ms. Diamond would need cooperation from SecTek and TDG.  Exhibit D59.  At this point, SecTek's lawyers had the audit workpapers.  *Id.*

On October 29, 2014, SecTek's lawyer sent a letter to Ms. Diamond's lawyer saying that Ms. Diamond needed to assume the defense of the tax assessment as a condition precedent to the possibility of sharing information with her.  Exhibit P207.

Pursuant to § 5.2.2(a) of the SPA, Ms. Diamond had a right to elect to assume the defense of the 2014 Tax Assessment with respect to Pre-Closing Taxes by giving notice to SecTek of her election to assume the defense and giving SecTek evidence acceptable to SecTek that Ms.

Diamond had adequate financial resources to defend against the 2014 Tax Assessment and fulfill her indemnification obligations to SecTek under the SPA. Exhibit P1, SPA, § 5.2.2(a) at SEC 13918.  Ms. Diamond admitted that she did not give SecTek any evidence of her financial resources for such a defense.  Diamond Depo. at 180:22-181:7.  Pursuant to § 5.2.2(c) of the SPA, because Ms. Diamond did not elect to assume the defense of the Tax Assessment with respect to Pre-Closing Taxes, SecTek may conduct the defense of the Tax Assessment at the expense of Ms. Diamond and Ms. Diamond "shall be bound by any determination resulting from such Third-Party Claim or any compromise or settlement effected by the Indemnified Person." Exhibit P1, SPA § 5.2.2(c) at SEC00013919.

### K.  SecTek Investigated Potential Defenses to the Tax Assessment

Mr. Blood testified that soon after receiving a copy of the Tax Assessment, he promptly attempted to file a protest of the Assessment.  Exhibit P119.  The protest, however, was received just after the expiration of the protest period.  Exhibit P118.  SecTek also promptly engaged an experienced New Mexico tax attorney, Suzanne Bruckner, Esq. ("Ms. Bruckner"), to represent TDG before the Department.  Ms. Bruckner testified that on behalf of TDG and SecTek, she investigated possible defenses to the Tax Assessment, including the determination that TDG must pay tax at an in-state rate.   She stated that SecTek and TDG began investigating whether there was a basis to contest the Department's finding that TDG must pay the in-state tax rate.   In this regard, and on a number of occasions since SecTek received the tax assessment at issue herein, Ms. Diamond and Mr. Bennett told Mr. Blood and SecTek's counsel that there existed some prior "agreement" between TDG and New Mexico, which they said may resolve all or part of the assessment.  Exhibits P122, P123, P203, P204.  Prompted by these communications, Mr. Blood had TDG employees spend many hours searching TDG paper and electronic files,

including at a storage facility, before eventually locating a file containing the Managed Audit Agreement and related documents.  Exhibits P124A, P125, P127, P128A, P129A.  Ms. Bruckner stated that she also spent time investigating the supposed prior agreement with New Mexico and its possible relationship to the Department's determination that TDG must pay GRT at an in-state rate, *inter alia*, by interviewing Mr. Bennett.

Consistent with what he led Mr. Blood to believe about the existence of a critical prior agreement, Mr. Bennett testified that, in addition to the Managed Audit Agreement, there was some other "agreement" with New Mexico.  Even though she led Mr. Blood to believe it was a "critical piece of paper," Ms. Diamond stated that she has never seen nor has any personal knowledge of this supposed other "agreement" or what it says, and only knows about it from what she was told by Mr. Bennett.  Diamond Depo. 171:7-24.  However, Mr. Bennett finally acknowledged that the supposed "other" agreement was in fact no agreement at all, but was the correspondence sent by the Department after the managed audit to invoice TDG for the amount of the self-reported tax still due.  Exhibit P128A.  SecTek spent much time and expense as a result of Mr. Bennett and Ms. Diamond searching for an "agreement" that does not exist.

During its investigation of potential defenses to the 2014 Tax Assessment, SecTek determined that the Department had accounted for all GRT payments made by TDG for the years covered by the Field Audit.  Exhibits P5, P95, P274, P235.  The Department's auditor based the 2014 Tax Assessment on the New Mexico gross receipts reported to him by Ms. Medina. Exhibit P5, SEC13484-495; Exhibits P6-P35; Exhibits P50-51, P53, P55, P57, P63, P66.  SecTek further examined whether Ms. Medina reported the correct amount of New Mexico gross receipts to the Department during the Field Audit.  *Id.*  SecTek determined that Ms. Medina underreported New

Mexico gross receipts by approximately $500,000 to $600,000.  Exhibits P267, P235, P95, P268, P242-243, P275, P6-35, P50-51, P53, P55, P57, P63, and P66.

Mr. Brown testified that during the 90-day protest window, New Mexico Taxation and Revenue Department allows a taxpayer to protest an assessment without paying the taxes assessed first.  Brown Depo. at 78:5-80:3. Once the 90-day window has passed, a taxpayer must pay the taxes assessed, whether correct or not, before the taxpayer can request a refund because the right to protest the assessment has been waived.  *Id.*  Although TDG was unable to protest the Tax Assessment during the 90-day period after its issuance, SecTek paid the taxes due for 2012 and successfully pursued a refund claim for 2012.  As a result, the Department reduced the tax due for January 2012 from $17,304.29 to $5,642.34.  Exhibits P190, P092.

**L.  The Texas Lawsuit Against TDG Post-Closing**

On or about August 1, 2013, TDG was served with notice of a lawsuit filed against TDG in Texas State Court, captioned *Clifton Hubbard, et al. v. The J. Diamond Group, Inc.,* Case No. DC-13-06523-J (the "Texas Lawsuit").  Exhibit P213. The Plaintiff in the Texas Lawsuit is not a party in the matter currently before the Court.   The Texas Lawsuit alleged various claims of negligence against TDG arising out of the actions of a former TDG employee on October 31, 2011, prior to the Closing Date.  *Id.*  On August 2, 2013, SecTek gave notice of the Texas Lawsuit to Ms. Diamond by email and hand-delivery.  Exhibit P214.

**M.  2014 Tax Assessment is Fixed and Established**

Following its assessment on TDG, New Mexico has automatic lien rights securing these unpaid amounts.  N.M. Stat. § 7-1-37.  New Mexico also has additional enforcement remedies. *See, e.g.,* N.M. Stat. § 7-1-31 (providing for levy of property to collect delinquent taxes).  The 2014 Tax Assessment became fixed and established when assessed in July 2014.  As a result, the

Department was entitled to take action to recover the unpaid taxes, interest, and penalties included in the 2014 Tax Assessment.

On June 18, 2015, the Department sent TDG a Notice of Claim of Tax Lien asserting a lien with respect to "all property, as well as rights to property of" TDG, which included all taxes, interest, and penalties assessed by the Department (the "2015 Tax Lien Notice"). Statement of Undisputed Facts ¶ 41; Exhibit P88. On June 22, 2015, the Department filed a copy of the 2015 Tax Lien Notice in Santa Fe County, New Mexico. Statement of Undisputed facts ¶ 42; Exhibit P89. Mr. Blood testified that in September 2016, New Mexico attached a SecTek bank account and released the attachment only after payment of $135,000, which was applied to the unpaid Pre-Closing Taxes. The Department thereafter agreed to stay further enforcement of its rights until December 2016. Exhibits P280-284.

### N. Ms. Diamond has not paid the Pre-Closing Taxes or Related Penalties and Interest

In February 2016, in response to a refund claim asserted by TDG for 2012, the Department reduced the tax due for January 2012 from $17,304.29 to $5,642.34. Exhibits P190, P92. Accordingly, the total Pre-Closing Taxes due as of November 7, 2016 for periods before the Closing Date is $521,423.28. As a result of TDG's successful refund claim, the Department also reduced the amount of interest and penalties due for January 2012 from $1,462.62 to $265.87 (interest) and from $3,460.89 to $1,128.46 (penalties). Exhibit P92. Through November 7, 2016, the total amount of taxes, penalties, and interest due for Pre-Closing Periods is $774,382.26 (total of $521,423.28 in taxes plus $252,958.98 in penalties and interest) (the "Tax Damages"). To date, Ms. Diamond has not indemnified SecTek for the Pre-Closing Taxes, accrued interest and penalties, or other losses attributable to the 2014 Tax Assessment, or for the costs incurred with respect to the 2014 Tax Assessment and the Pre-Closing Taxes.

On October 1, 2015, SecTek provided Ms. Diamond notice of its fraud claims in conformance with the SPA. Exhibit P187. As explained by Mr. Smigocki, Ms. Diamond's false representations concerning the Albuquerque Office, TDG's taxes, and ultimately, TDG's financial performance during pre-closing years, caused SecTek to overpay by over $700,000 for Ms. Diamond's stock in TDG.

## CONCLUSIONS OF LAW

### I. Count One—Breach of Contract (Tax Indemnification)

Plaintiff alleges that Ms. Diamond breached the SPA's Special Indemnity (§ 5.1.5(a)) for failing to indemnify SecTek for the Tax Damages (i.e., Pre-Closing Taxes and the related penalties and interest that have been imposed on TDG) totaling $774,382.26. Plaintiff also alleges that Ms. Diamond's failure to pay the Pre-Closing Taxes constitutes a breach of various other provisions of the SPA, including the Tax Warranty (i.e., there are unpaid Taxes for pre-closing periods), the General Warranty (i.e., Ms. Diamond's representations and warranties are accurate), and the Financial Warranty (i.e., there are no undisclosed liabilities of TDG even though the Pre-Closing Taxes were not disclosed).

Under Virginia law, the elements of a breach of contract claim are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of the obligation. *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004) (citation omitted). When contract terms are clear and unambiguous, the court must construe those terms according to their plain meaning. *Hutter v. Heilmann*, 475 S.E.2d 267, 270 (Va. 1996) (citing *Bridgestone/Firestone v. Prince William Square*, 463 S.E.2d 661, 664 (Va. 1995)). Additionally, "[t]he law will not insert by

30

construction, for the benefit of a party, an exception or condition which the parties omitted from their contract by design." *Id.* (citing *Bridgestone/Firestone*, 463 S.E.2d at 664).

SecTek has the burden of proving, by a preponderance of the evidence, the facts necessary to support its contract claims against Diamond. *Carley Capital Grp. v. City of Newport News*, 709 F. Supp. 1387, 1396 (E.D. Va. 1989) (citing *Chittum v. Potter*, 219 S.E.2d 859, 863 (Va. 1975)). Proof rises to this level of persuasion when "it is made to appear more likely or probable in the sense that actual belief in its truth, derived from the evidence, exists in the mind or minds of the tribunal, notwithstanding any doubts that may still linger there." *Smith v. Rockingham*, No. 0991-10-4, 2011 WL 588503, at *2 (Va. Ct. App. Feb. 22, 2011) (quoting *N. Virginia Power Co. v. Bailey*, 73 S.E.2d 425, 429 (Va. 1952)).

Pursuant to the Special Indemnity in the SPA (§ 5.1.5(a)), Ms. Diamond agreed to indemnify SecTek for "any liability for any Taxes imposed on [TDG] . . . pursuant to federal, state, local, or foreign Law and for Losses attributable to any periods or portions thereof ending on or before the Closing Date in excess of Taxes which are included as liabilities for the purposes of computing Estimated Closing Net Working Capital or Actual Closing Net Working Capital." The SPA defines "Taxes" as including "gross receipts taxes" and "any interest or penalties with respect thereto." *See* SPA § 3.9.1. The Pre-Closing Taxes, and interest and penalties thereon are a liability for "Taxes" which has been "imposed" on TDG by the State of New Mexico and, pursuant to § 5.1.5(a) of the SPA, Ms. Diamond is required to indemnify SecTek TDG's liability to the State of New Mexico as well as for "Losses" attributable to such liabilities, including the attorneys' fees incurred by SecTek in responding to the assessment of Pre-Closing Taxes.

In the SPA, Ms. Diamond and TDG warranted and represented to SecTek that TDG had paid all GRT due as of the date of the SPA and that all GRT for which TDG was liable, for periods before the Closing Date, had been paid. *See* SPA § 3.9.1. In the Tax Warranty, Ms. Diamond and TDG further represented that TDG had filed all of its Tax Returns in accordance with applicable law. In light of the Department's imposition of gross receipts taxes for pre-closing periods and its issuance of the Tax Lien Notice, TDG breached the Tax Warranty. TDG's representations in the SPA were false in that, before the Closing Date, TDG had – as determined by the State of New Mexico – not paid all GRT that was due for Pre-Closing periods during 2008 – 2012. Furthermore, Ms. Diamond's failure to pay the Pre-Closing Taxes constitutes a breach of her warranties under the SPA, including the Tax Warranty (i.e., there are unpaid Taxes for pre-closing periods), the General Warranty (i.e., Diamond's representations and warranties are accurate), and the Financial Warranty (i.e., there are no undisclosed liabilities of TDG even though the Pre-Closing Taxes were not disclosed).

For indemnity claims arising from the "Special Indemnities," or § 5.1.1(d) of the SPA permits SecTek to make written notice any time prior to the date that is thirty days after the expiration of the applicable statute of limitations. For indemnity claims arising under § 5.1.2 of the SPA, § 5.1.1(a) permits SecTek to make written notice of an indemnification claim indefinitely. Under New Mexico law, a tax assessment must generally be made by the State within three years from the end of the calendar year in which the payment of the tax was due. *See* New Mexico Stat. Ann. § 7-1-18.A. The limitations period for an assessment by the State extends to six years if a taxpayer, in a return, understates by more than 25% the amount of its liability for the period to which the return relates. *Id.* § 7-1-18.D. As set forth in the September 26, 2014 Statement of Account, the Pre-Closing Taxes included GRT due for periods in 2008

through January 2012. The October 14, 2014 Notice Letter timely notified Ms. Diamond of SecTek's indemnification claim.

<u>1. SecTek Is Entitled To Recovery Under § 5.1.2 of the SPA</u>

Ms. Diamond breached the Tax Warranty because TDG failed to pay "currently as due all taxes levied or imposed including . . . gross receipts taxes." *See* SPA, § 3.9.1. Under the Tax Warranty, Ms. Diamond falsely warranted that TDG had accurately reflected all tax liabilities on its Tax Returns, and that "all" Taxes for which TDG was liable before the Closing Date were paid. *Id.* TDG's representations at closing as reflected in the Tax Warranty were false because GRT was delinquent as of the Closing Date, and facts existed for the imposition of a tax lien upon TDG. The 2014 Tax Assessment and the Tax Lien Notice clearly evidence Ms. Diamond's breaches of the Tax Warranty, for New Mexico GRT for periods before the Closing Date, and TDG's failure to pay or accurately reflect such liabilities on its pre-Closing Date tax returns constitutes a breach of the Tax Warranty by Ms. Diamond, proximately causing substantial damages to SecTek.

Because her representations and warranties in § 3.9.1 of the SPA were false, the Court holds that Ms. Diamond must "indemnify, defend, and hold harmless" SecTek for liability for the Pre-Closing Taxes (plus penalties and interest accrued thereon), as they relate to the operation of TDG before the Closing Date. *See* SPA §§ 5.1.1(a)(i), 5.1.2(a), (d). SecTek has proven by a preponderance of the evidence Ms. Diamond's breach of the Tax Warranty. SecTek is granted a judgment against Ms. Jeanette Diamond in the amount of the Tax Damages—$774,382.26—plus any interest and penalties that accrue after November 7, 2016 on the Pre-Closing Taxes, and prejudgment interest on any amounts paid by SecTek toward the Pre-Closing Taxes from the date of such payments.

33

### 2. SecTek Is Entitled To Recovery of Damages Arising From Seeking Indemnification Under The SPA

Pursuant to § 5.1.2(e) of the SPA, Ms. Diamond must indemnify, defend, and hold harmless SecTek for all Losses it has incurred—and continues to incur—in enforcing its indemnification rights under the SPA.  By definition, under the SPA, "Losses" include "reasonable attorneys' fees and expenses."  SecTek has incurred, and continues to incur, attorneys' fees and expenses arising from the 2014 Tax Assessment of Pre-Closing Taxes, its pre-litigation efforts to obtain indemnification from Ms. Diamond, and this lawsuit in which SecTek seeks to enforce its contractual right to indemnification.  The Court holds that SecTek is also entitled to judgment in its favor with regard to all Losses incurred in the enforcement of its indemnity rights under the SPA.  SecTek is to submit a petition for award of attorneys' fees and costs within 30 days of the date of this judgment and Defendant Ms. Diamond is to respond within 30 days.  SecTek may reply within 14 days of Ms. Diamond's response, and the Court will rule on the papers by separate judgment.

### 3. Diamond's Defense With Respect To SecTek Providing Timely Notice Fails Because She Was Not Materially Prejudiced

Ms. Diamond contends that SecTek failed to provide her timely notice of the 2014 Tax Assessment.  The evidence presented to the Court indicates otherwise.  The testimony at trial demonstrated that SecTek first became aware of the underlying Tax Assessment in early October 2014.  It is undisputed that on October 14, 2014, SecTek sent the Notice Letter to Ms. Diamond, demanding indemnification for the 2014 Tax Assessment in compliance with the SPA.  Thus, SecTek did not delay in notifying Ms. Diamond of the 2014 Tax Assessment.

Even assuming that SecTek delayed in providing notice to Ms. Diamond of the 2014 Tax Assessment, such delay does not excuse Ms. Diamond from her indemnification obligations

under the SPA.  Pursuant to § 5.2.1 of the SPA, "no failure or delay on the part of [SecTek] in notifying [Diamond] will relieve [Diamond] from any obligation under this Article 5 except to the extent that the failure or delay *materially prejudices the defense of the [2014 Tax Assessment]* by [Diamond]."

Here, based on the evidence presented, any delay did not "materially prejudice the defense" of the 2014 Tax Assessment—Ms. Diamond has not articulated any basis for challenging the 2014 Tax Assessment.  Ms. Diamond questions whether TDG should have been subject to the in-state GRT rate.  However, Ms. Diamond ignores the fact that TDG maintained the Las Cruces Office until 2011 and the Central Avenue Office from December 2009 through the Closing Date, which required TDG to pay GRT at the in-state rate.  Regulation 3.1.4.13(A) NMAC. Moreover, even assuming that New Mexico would somehow permit TDG to avoid having a "place of business" in New Mexico by having offices leased in the names of employees, TDG would nevertheless be subjected to GRT at the in-state rate by virtue of its use of its customers' locations.  Regulation 3.1.4.13(G) NMAC.  Accordingly, the Court concludes that Ms. Diamond was not materially prejudiced.

**II. Count Two—Breach of Contract (Indemnification for Texas Lawsuit)**

Under Virginia law, the elements of a breach of contract claim are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of the obligation.  *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004) (citation omitted).  Under § 5.1.2(d) of the SPA, Ms. Diamond is obligated to indemnify SecTek for Losses related to the Texas Lawsuit.  SecTek provided Ms. Diamond with notice of the Texas Lawsuit, wherein SecTek requested that Ms. Diamond indemnify SecTek for any losses related to the Texas Lawsuit.  Ms. Diamond refused

to indemnify SecTek for losses incurred in connection with the Texas Lawsuit. Ms. Diamond's refusal to indemnify SecTek for Losses relating to the Texas Lawsuit is a material breach of the SPA.

SecTek has performed all of its obligations under the SPA. Despite SecTek's compliance with the notice and demand provisions of the SPA, payment has not been made by Ms. Diamond. Insurance covered damages awarded in the lawsuit, but did not cover attorney's fees. As of the filing of the Second Amended Complaint, the total amount due and owing SecTek under the SPA for the Texas Lawsuit is $8,845.02, plus additional attorneys' fees and collection costs which continue to accrue. SecTek is entitled to Judgment against Jeanette S. Diamond for Count Two in the amount of $8,845.02 plus additional attorneys' fees and collection costs, which continue to accrue.

### III.  Count Three—Fraud in the Inducement

Count Three is SecTek's claim against Ms. Diamond for fraud in the inducement. SecTek alleges, *inter alia*, that it "reasonably and justifiably relied on the information provided by Ms. Diamond throughout the due diligence process regarding the finances, assets, liabilities, taxes, obligations, and real property interests of TDG." Second Am. Compl. ¶ 66. SecTek further alleges that "but for Diamond's intentional misrepresentation and concealment of material facts regarding [The Diamond Group's ("TDG")] assets, finances, taxes, obligations, liabilities, operations, and real property interests of TDG, including about the existence of the Albuquerque Office, SecTek would not have purchased TDG at the Purchase Price, if at all." *Id.* ¶ 67.

Under Virginia law, fraud in the inducement occurs when one provides "a false representation of a material fact, constituting an inducement to the contract, on which the

purchaser had a right to rely. . . .'" *Abi-Najm v. Concord Condominium, LLC*, 699 S.E.2d 483, 489 (Va. 2010) (citation omitted). "Fraud in the inducement of a contract is [] grounds for an action for damages," but can also be grounds for a tort remedy. *Id.* 489-90 (citation omitted). Notably, Virginia courts have recognized the applicability of the doctrine of agency in the context of claims for fraud. *See, e.g., Nationwide Ins. Co. v. Patterson*, 331 S.E.2d 490, 493 (Va. 1985) (affirming a judgment against insurance company in favor of a customer on claim for constructive fraud based on misrepresentations by one of the defendants' insurance agents); *Dudley v. Estate Life Ins. Co.*, 257 S.E.2d 871, 875 (Va. 1979) ("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud") (internal citations omitted).

A statement known to be false when uttered, that is made with the intent to induce someone to enter into a contract, can support a claim of fraud that is independent of a breach of contract. *See Barnette v. Brook Road, Inc.*, 429 F. Supp. 2d 741, 750 (E.D. Va. 2006). The standard of proof for both common law actual fraud and common law constructive fraud is clear and convincing evidence. *Davis v. Marshall Homes*, 576 S.E.2d 504, 506 (Va. 2003); *Eden v. Weight*, 578 S.E.2d 769, 774 (Va. 2003). "Fraud may be proved not only by direct evidence, but also circumstantial evidence." *Fox Rest Assocs., L.P. v. Little*, 717 S.E.2d 126, 131 (Va. 2011) (citing *Hutcheson v. Sav. Bank of Richmond*, 105 S.E. 677, 680 (1921)). "Because of the difficulty of establishing 'actual intent,' evidence of fraud may be, and generally must be, circumstantial." *Fox Rest Assocs.*, 717 S.E.2d at 131 (quoting *In re Porter*, 37 B.R. 56, 63 (Bankr. E.D. Va. 1984)).

Here, the evidence shows that, in late 2009 and 2010, TDG twice placed office leases in the name of an employee and did so soon after Mr. Bennett and Ms. Diamond realized that TDG's offices subjected TDG to GRT at a higher, in-state rate. The fact that TDG did this twice in the same time frame indicates that it was not a coincidence, but rather was done intentionally to hide the existence of these offices from New Mexico taxing authorities. The Court finds that Ms. Diamond's testimony is not credible when she claims that she did not know that her children were paying rent and helping set up the Las Cruces Office. Ms. Diamond's children were instrumental in this ruse. The Las Cruces Office was leased in the name of Ms. Diamond's daughter, Wendy Eisen, and Ms. Diamond's son—Stuart Diamond—helped to set up the Central Avenue Office at the instruction of Jack King. There was no evidence offered by Ms. Diamond of a legitimate business reason to lease office space for TDG in her daughter's name, and the Court cannot find one in the absence of evidence. Rather, the evidence shows a scheme to illegally reduce TDG's New Mexico Tax liability.

Before the SPA was entered into, SecTek conducted due diligence with Ms. Diamond, both directly and through her agents Mr. Bennett and Mr. King, to obtain information about TDG's financial and operational status. Ms. Diamond knew SecTek was utilizing the information received in response to its due diligence inquiries to determine whether it wanted to acquire her stock in TDG and, if so, at what price. Before the SPA was entered into, Ms. Diamond, personally and through her agents Mr. Bennett and Mr. King, falsely represented both orally and in writing to SecTek that TDG did not lease or maintain an office location in New Mexico. Notably, Mr. King told Mr. Blood that TDG did not have an office in New Mexico, when he knew he had instructed Mr. Chavez to seek assistance from Stuart Diamond to set up phone lines and internet in the Central Avenue office.

Furthermore, in Article 3 of the SPA, "[t]o induce Buyer to enter into this Agreement," Ms. Diamond provided the Tax Warranty, the Lease Warranty, the Property Warranty, and the Financial Warranty. SecTek was entitled to rely on these representations. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 620 (4th Cir. 1999) (noting, in opinion reversing grant of motion to dismiss in context of due diligence in the course of a financial transaction, that "[t]he cases in Virginia are clear, however, that 'one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth'") (quoting *Nationwide Ins. Co. v. Patterson*, 331 S.E.2d 490, 492 (Va. 1985)).

Clear and convincing evidence shows that Ms. Diamond knew about the scheme to hide the existence of the Las Cruces Office and the Central Avenue Office from New Mexico taxing authorities. Ms. Diamond failed to disclose to SecTek, prior to closing on the SPA, TDG liability for unpaid Gross Receipts Tax and penalties accrued by the presence of the Central Avenue Office. Such disclosure may well have resulted in discovery of TDG's scheme to evade taxes. SecTek made written due diligence requests to TDG, Ms. Diamond, and Mr. Bennett, who falsely advised that TDG's corporate office in Dallas was the only leased property. Ms. Diamond and TDG, by Mr. Bennett and Mr. King, intentionally concealed the material fact that TDG had established a business location in Albuquerque for purpose of New Mexico GRT reporting and liability obligations.

Most notably, in November 2011, before closing under the SPA, Mr. Blood attended meetings in Dallas with TDG staff and questioned Mr. King, TDG's Director of Operations, about TDG's presence in New Mexico. Mr. Blood specifically asked Mr. King whether TDG had any offices in addition to the Dallas corporate office and Mr. King falsely said that TDG did

not have any other offices.  Moreover, during the due diligence process, Ms. Diamond, through her agents, produced to TDG business records that did not accurately or fairly represent the financial and operational status of TDG in that such records did not reflect amounts due for GRT for periods before the Closing Date or the existence of the Central Avenue Office.

This information was material – in fact fundamental – to the calculation of the actual amount of TDG's GRT in New Mexico and to the valuation of TDG.  SecTek reasonably relied upon this material information in determining whether or not to acquire TDG and in determining the price it was willing to pay for Ms. Diamond's TDG stock.  Ms. Diamond, through her agents, willfully provided false financial information about TDG to SecTek and made false statements and misrepresentations regarding the existence of the Central Avenue Office.

SecTek reasonably and justifiably relied on the information provided by Ms. Diamond throughout the due diligence process regarding the finances, assets, liabilities, taxes, obligations and real property interests of TDG.  As a direct result of the misrepresentations that Ms. Diamond made through her agents, SecTek was misled as to the true value of TDG and, thus, overvalued the company.  But for Ms. Diamond's intentional misrepresentation and concealment of material facts regarding TDG's assets, finances, taxes, obligations, liabilities, operations and real property interests of TDG, including about the existence of the Albuquerque Office, SecTek would not have purchased TDG at the Purchase Price, if at all.

SecTek has shown by clear and convincing evidence that Ms. Diamond intentionally made false representations in due diligence.  The financial records submitted by Ms. Diamond to SecTek did not accurately reflect TDG's New Mexico Gross Receipts Tax liability, which caused SecTek damages.   As a direct result of Ms. Diamond's aforementioned misrepresentations and omissions of material facts, and considering Mr. Smigocki's testimony

regarding damages, the Court concludes that SecTek overpaid for TDG in an amount not less than $719,780.00. Thus, the Court grants SecTek a judgment in the amount of $719,780.00 plus prejudgment interest from the Closing Date.

With respect to punitive damages, SecTek has not shown that Ms. Diamond harbored malice. Accordingly, the Court denies SecTek's request for punitive damages.

### IV. Count Four—Constructive Fraud in the Inducement

Count Four is SecTek's claim for constructive fraud in the inducement. SecTek alleges, *inter alia*, that Ms. Diamond negligently provided false financial information about TDG to SecTek and negligently made false statements and misrepresentations to conceal the existence of the Albuquerque Office. Second Am. Compl. ¶ 74. Moreover, SecTek alleges that but for Ms. Diamond's negligent misrepresentations and concealment of material facts regarding TDG's assets, finances, taxes, obligations, liabilities, operations, and real property interests of TDG, including about the existence of the Albuquerque Office, SecTek would not have purchased TDG at the purchase Price, if at all. *Id.* ¶ 75.

The Court has considered whether SecTek has shown both intentional fraud in the inducement to contract and constructive fraud. Because the Court has determined that Ms. Diamond is liable for intentional fraud in the inducement as explicated in Count Three, the Court concludes that Ms. Diamond's actions were not negligent false statements. Accordingly, the Court denies SecTek's claim for constructive fraud and enters judgment in favor of Ms. Diamond on this claim.

### V. Count Five—Breach of Contract (Indemnification for Fraud Claim)

Count Five is SecTek's breach of contract—indemnification for fraud claim. Under the terms of the SPA, SecTek is entitled to indemnification from Ms. Diamond for losses related to

Fraud Claims resulting from Ms. Diamond's misrepresentations and omissions. Exhibit P1, SPA, SEC0013920. SecTek alleges that the misrepresentations and omissions Ms. Diamond made before the SPA was entered into carried through to the SPA as false representations, *inter alia*, of each of the Financial Warranty, the Tax Warranty, the Lease Warranty, the Property Warranty, the Legal Compliance Warranty, and the General Warranty. (Dkt. 67 ¶ 79). SecTek alleges that the false representations and omissions by Ms. Diamond before the SPA and within the SPA give rise to Fraud Claims under the SPA. *Id.*

Under Virginia law, the elements of a breach of contract claim are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of the obligation. *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004) (citation omitted).

Section 5.4.1 of the SPA defines "Fraud Claims" as "fraud or intentional misrepresentation." Pursuant to § 5.1.1(e), such claims may be brought "indefinitely". For the reasons discussed in Count Three, SecTek is entitled to be indemnified for its damages related to Ms. Diamond's fraud and all Losses it has suffered as a result of Ms. Diamond's misrepresentations plus prejudgment interest from the Closing Date.

The Court holds that because SecTek has proven the underlying fraud claim by clear and convincing evidence, SecTek has necessarily proven the breach of contract claim regarding fraud by a preponderance of the evidence. The evidence demonstrates that Ms. Diamond and her agents produced business records to SecTek that did not accurately or fairly represent the financial and operational status of TDG in that such records did not accurately reflect amounts due for GRT for periods before the closing date or the existence of the Albuquerque office. This information was material to the calculation of the actual amount of TDG GRT in New Mexico

and to SecTek's valuation of TDG.   Ms. Diamond's agents provided false financial information about TDG to SecTek and made false statements and misrepresentations to conceal the existence of the Central Avenue Office in Albuquerque.

For the reasons discussed in Count Three, SecTek is entitled to be indemnified for its damages related to Ms. Diamond's fraud and all Losses it has suffered as a result of Ms. Diamond's misrepresentations plus prejudgment interest from the Closing Date.   Ms. Diamond and her agents produced business records to SecTek that did not accurately or fairly represent the financial, tax, liability, and operational status of TDG in that such records did not accurately reflect amounts due for GRT for periods before the closing date or the existence of the Albuquerque office.   This information was material to the calculation of the actual amount of TDG GRT in New Mexico and to SecTek's valuation of TDG.   Ms. Diamond's agents provided false financial information about TDG to SecTek and made false statements and misrepresentations to conceal the existence of the Central Avenue Office in Albuquerque.   Thus, the Court grants SecTek a judgment against Ms. Diamond.   Although the Court rules in favor of SecTek on this Count, the Court will not award SecTek additional damages because the Court has already awarded damages for fraud in the inducement (Count Three).   *See Diaz Vicente*, 736 F. Supp. at 696 ("Although plaintiffs are entitled to damages under various legal theories, they are only entitled to receive one recovery for their single injury.")

### VI. Count Six—Securities Fraud

Count Six is SecTek's Securities Fraud claim under 17 C.F.R. § 240.10b-5.   SecTek alleges that Ms. Diamond, *inter alia*, directly or indirectly:

> a.   employed devices, schemes, or artifices to defraud SecTek;

b.   made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   engaged in acts, practices, or courses of business which operated as a fraud or deceit upon SecTek, as the purchaser of her TDG stock, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, promulgated thereunder.

Second Am. Compl. ¶ 84.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibit making any material misstatement or omission in connection with the purchase or sale of any security. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (citation omitted). To recover damages for violations of Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* A party seeking recovery under § 10(b) need only prove its cause of action by a preponderance of the evidence, not clear and convincing evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 (1983).

The reliance element "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Id.* (citation omitted). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Id.*

44

To demonstrate scienter, a plaintiff must show that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (citation omitted).   Mere negligence will not suffice. *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338 (4th Cir. 2003) (citation omitted). Reckless behavior may be enough to satisfy the scienter requirement in a securities fraud suit. *See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009). Recklessness, however, must be "severe," which is in essence a "slightly lesser species of intentional misconduct." *Ottmann*, 353 F.3d at 344.

Ms. Diamond's actions, as described in Counts Three and Four, are evidence of SecTek's success with respect to this claim.  SecTek has shown that Ms. Diamond, through her agents and in connection with her sale of her TDG stock, directly or indirectly made untrue statements of material fact.  The actions of Ms. Diamond and her agents were intentional and made to induce SecTek into purchasing TDG through the Stock Purchase Agreement.   It is clear from the evidence adduced at trial that Ms. Diamond and her agents possessed "a mental state embracing intent to deceive, manipulate, or defraud." *Zak*, 780 F.3d at 606.

Ms. Diamond also failed to state material facts necessary to make the statements made, given the circumstances, not misleading.  For example, underreported and underpaid GRT from previous years were not accounted for in the financial data SecTek was provided in due diligence and, accordingly, in the valuation performed by Mr. Smigocki.   Moreover, Ms. Diamond, through her agents, engaged in acts, practices, or courses of business which operated as a fraud or deceit upon SecTek, as the purchaser of her TDG stock, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder.

Ms. Diamond and TDG were involved in a ruse to misrepresent and understate TDG's Gross Receipts Tax liability.

Additionally, Mr. King was aware of the existence of the Central Avenue Office because he instructed Mr. Chavez to contact Stuart Diamond to set up internet and telephone connections. Mr. King however, concealed this information from Mr. Blood, and Mr. Blood testified that he would have altered his purchasing decision if he possessed the information. With respect to the reliance element of a securities fraud violation, this information was material to the calculation of the actual amount of TDG GRT in New Mexico and to SecTek's valuation of TDG. Mr. Blood stated that it would have been material information to him if, at any time before closing under the SPA, he or SecTek were told the truth about TDG maintaining an office in Albuquerque. Had he been told that, in combination with his observation that TDG was paying GRT at a low rate, Mr. Blood emphasized that he would have realized before closing that TDG had been underpaying its taxes and, that the valuation of TDG for purposes of negotiating the purchase price for Ms. Diamond's TDG stock was too high.

Ms. Diamond's agents provided false financial information about TDG to SecTek and made false statements and misrepresentations to conceal the existence of the Central Avenue Office in Albuquerque. But for Diamond's intentional misrepresentations and concealment of material facts regarding TDG's assets, finances, taxes, obligations, liabilities, operations, and real property interests of TDG, including about the existence of the Central Avenue Office, SecTek would not have purchased TDG at the Purchase Price, if at all. SecTek suffered economic loss in that it overpaid for TDG. This loss was intentionally caused by Ms. Diamond and her agents. Consequently, the Court grants SecTek a judgment against Ms. Diamond. Although the Court rules in favor of SecTek on this Count, the Court will not award SecTek

additional damages because the Court has already awarded damages for fraud in the inducement (Count Three). *See Diaz Vicente v. Obenauer*, 736 F. Supp. at 690.

### VII. Count Seven—Specific Performance (Tax Indemnification)

"The decision whether to grant specific performance of a contract is a matter submitted to the sound discretion of the trial court." *Chattin v. Chattin*, 427 S.E.2d 347, 350 (Va. 1993) (citing *Griscom v. Childress*, 31 S.E.2d 309, 312 (Va. 1944)). Specific performance is an equitable remedy, which should be granted or refused under established equitable principles and the facts of a particular case. *Cangiano v. LSH Bldg. Co.*, 623 S.E.2d 889, 894 (Va. 2006). Courts routinely grant specific performance after concluding that a defendant has breached its contractual obligations. *See, e.g., Wooten v. Lightburn*, 579 F. Supp. 2d 769, 777-79 (W.D. Va. 2008) (granting specific performance of a contract to sell real property at a specified price per acre), *aff'd*, 350 F. App'x 812 (4th Cir. 2009); *Haythe v. May*, 288 S.E.2d 487, 489 (Va. 1982) (reversing and ordering a grant of specific performance of a contract); *Thompson v. Commonwealth*, 89 S.E.2d 64, 67-69 (1955) (affirming a grant of specific performance of a contract to build voting booths). Additionally, a party "may not take advantage of its own breach of contract by leaving Plaintiff with no remedy at law or equity." *Thompson*, 89 S.E.2d at 67.

Here, since the Court granted judgment in favor of SecTek on its breach of contract claims, SecTek's request for specific performance is DENIED because SecTek has a remedy at law.

### VIII. Count Eight—Specific Performance (Indemnification for Texas Lawsuit)

As with Count Seven, the Court has granted judgment in favor of SecTek on Count Two—Breach of Contract with respect to indemnification for the Texas Lawsuit. Accordingly, SecTek's request for specific performance is DENIED because SecTek has a remedy at law.

## IX. Counterclaim 1—Breach of Contract (Breach of the Implied Covenant of Good Faith and Fair Dealing)

The Court holds that Ms. Diamond has met her burden in proving, by a preponderance of the evidence, that SecTek breached the implied covenant of good faith and fair dealing. In Virginia, every contract contains an implied covenant of good faith and fair dealing. *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (citing *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541-42 (4th Cir. 1998); *Penn Life Ins. Co. v. Bumbrey*, 665 F. Supp. 1190, 1195 (E.D. Va. 1987). "[A]lthough the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite, Ltd.*, 156 F.3d at 542 (citations omitted). The elements of a claim for breach of an implied covenant of good faith and fair dealing are (1) a contractual relationship between the parties, and (2) breach of the implied covenant. *Charles E. Brauer Co., v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 386 (Va. 1996).

Ms. Diamond has asserted a Counterclaim against SecTek for breach of the implied covenant of good faith and fair dealing. (Dkt. 69 at ¶¶ 1-6). In particular, Ms. Diamond asserts that she is entitled to certain amounts received by SecTek pursuant to a contract colloquially known as the "Piper Down" Contract. *Id.* ¶ 6. The Piper Down contract included $87,645.00 in wage adjustments to be billed for TDG security services provided to IRS buildings in Texas. Exhibit P172. Section 2.5(a) of the SPA provides that Ms. Diamond will be paid "any area wage determination adjustments unbilled at the Closing Date relating to the contracts identified on Schedule 2.5(a)." Exhibit P1, SPA at § 2.5(a). Schedule 2.5(a) identifies the Piper Down contract. Exhibit P172. This schedule was emailed to Mr. Blood the day before closing. Exhibit

P172.   When the SPA was executed, the $87,645.00 had not been invoiced and these funds rightfully belonged to Ms. Diamond.

Ms. Diamond testified that the wage adjustment arose after a disgruntled taxpayer flew an airplane into the side of an IRS building in Austin, Texas, which required TDG to provide emergency 24-hour service at that building, in addition to other IRS buildings.   On September 30, 2013, Ms. Diamond sent an email to Mr. Blood requesting the funds owed to her under the Piper Down Contract.   Exhibit P191 at BLF001105.   After exchanging unpleasantries, Mr. Blood told Ms. Diamond to stop contacting Ms. Medina about receivables, and that Ms. Diamond should "begin doing some work for the $100k" that she was being paid.   *Id.*   Ms. Diamond asserted that Mr. Blood had a duty to forward funds within 3 days of receipt from the payment of invoice, and also a duty to instruct staff to follow normal accounting functions, such as collections.   *Id.*

The SPA represents a valid contract that was entered into under Virginia law.   Section 2.5(a) placed an implied duty on SecTek to make a good faith effort to submit wage adjustments for the contracts listed in Schedule 2.5(a), one of which was the Piper Down Contract.   Ms. Diamond attempted to collect money related to the Piper Down Contract, but Mr. Blood refused to cooperate and instructed her to retrieve the money on her own without Mr. Blood's assistance. Moreover, Mr. Blood refused to invoice the IRS for the Piper Down wage adjustment for no other reason than Mr. Blood's angst towards Ms. Diamond for the underlying Tax dispute.   Mr. Blood's refusal to pursue TDG's claim amounts to a breach of the implied covenant of good faith and fair dealing.   As a result of Mr. Blood's willful decision not to invoice the IRS for the Piper Down wage adjustment, Ms. Diamond did not, and has not, received $87,645.00 that lawfully belongs to her under the SPA.

The Court rules in favor of Ms. Diamond with respect to her Counterclaim. This is a contingent liability and TDG must file the claim, pursue the adjustment, and invoice the IRS as necessary.  If a wage adjustment is granted, then TDG must pay Ms. Diamond $87,645.00 as required by the SPA.

## CONCLUSION

The Court enters judgment in favor of Plaintiff SecTek on Counts 1, 2, 3, 5, and 6 because the Plaintiff has met its burden in demonstrating: (1) by a preponderance of the evidence, that Defendant Jeanette S. Diamond breached the terms of the Stock Purchase Agreement; and (2) by clear and convincing evidence, that Defendant Jeanette S. Diamond fraudulently induced SecTek into executing the Stock Purchase Agreement.  With respect to Count 4, which is Plaintiff's claim for constructive fraud in the inducement, the Court enters judgment in favor of Defendant Jeanette S. Diamond and against Plaintiff SecTek, Incorporated. Additionally, the Court enters judgment in favor of Defendant Jeanette S. Diamond on her counterclaim of breach of the implied covenant of good faith and fair dealing because SecTek CEO Wilfred Blood's actions with respect to tendering funds owed to Defendant under the SPA amount to bad faith.

Accordingly,

**IT IS HEREBY ORDERED** that judgment is entered in favor of Plaintiff SecTek, Incorporated and against Defendant Jeanette S. Diamond on the claim for breach of contract relating to indemnification under the SPA for the tax assessment, as stated in Count One of the Second Amended Complaint.  SecTek is granted a judgment against Ms. Jeanette Diamond in the amount of the Tax Damages—$774,382.26—plus any interest and penalties that accrue after

November 7, 2016 on the Pre-Closing Taxes, and prejudgment interest on any amounts paid by Plaintiff toward the Pre-Closing Taxes from the date of such payments.

**IT IS FURTHER ORDERED THAT** judgment is entered in favor of Plaintiff SecTek and against Defendant Jeanette S. Diamond on the claim of breach of contract related to the Texas Lawsuit, as stated in Count Two of the Second Amended Complaint.  Plaintiff is awarded damages for Count Two in the amount of $8,845.02 plus additional attorneys' fees and collection costs, which continue to accrue.

**IT IS FURTHER ORDERED THAT** judgment is entered in favor of Plaintiff SecTek, Incorporated and against Defendant Jeanette S. Diamond on the claim of fraud in the inducement as stated in Count Three of the Second Amended Complaint.  Plaintiff is awarded damages for Count Three in the amount of $719,780.00 plus prejudgment interest from the Closing Date.  The Court will not award punitive damages due to the absence of malice.

**IT IS FURTHER ORDERED THAT** judgment is entered in favor of Defendant Jeanette S. Diamond and against Plaintiff SecTek, Incorporated on the claim of constructive fraud in the inducement as stated in Count Four of the Second Amended Complaint.

**IT IS FURTHER ORDERED THAT** judgment is entered in favor of Plaintiff SecTek, Incorporated and against Defendant Jeanette S. Diamond on the claim for breach of contract relating to indemnification under the SPA for fraud, as stated in Count Five of the Second Amended Complaint. Although the Court rules in favor of Plaintiff on this Count, the Court will not award Plaintiff additional damages because the Court has already awarded damages for fraud in the inducement (Count Three).

**IT IS FURTHER ORDERED THAT** judgment is entered in favor of Plaintiff SecTek, Incorporated and against Defendant Jeanette S. Diamond on the claim of securities fraud as

stated in Count Six of the Second Amended Complaint.  Although the Court rules in favor of

Plaintiff on this Count, the Court will not award Plaintiff additional damages because the Court

has already awarded damages for fraud in the inducement (Count Three).

**IT IS FURTHER ORDERED THAT** Plaintiff SecTek, Incorporated's claim for

specific performance for breach of contract as stated in Count Seven is **DENIED** because

Plaintiff has a remedy at law.

**IT IS FURTHER ORDERED THAT** Plaintiff SecTek, Incorporated's claim for

specific performance for breach of contract as stated in Count Eight is **DENIED** because

Plaintiff has a remedy at law.

**IT IS FURTHER ORDERED THAT** judgment is entered in favor of Defendant

Jeanette S. Diamond and against Plaintiff SecTek, Incorporated on the counterclaim of breach of

the implied covenant of good faith and fair dealing, as stated in Amended Counterclaim One.

Defendant Jeannette S. Diamond is awarded damages against Plaintiff SecTek, Incorporated on

Amended Counterclaim One in the amount of $87,645.00.

A separate Rule 58 Judgment Order will issue with this Memorandum Opinion and

Order.

**IT IS SO ORDERED**.

ENTERED this _5th_ day of April 2017.

Alexandria, Virginia
4/5th/ 2017

_____ /s/
Gerald Bruce Lee
United States District Judge